IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LAURA J. (MUNCH) SIMPSON,            )
                                     )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )    No. 05 C 2592
                                     )
OFFICE OF THE CHIEF JUDGE OF         )
THE CIRCUIT COURT OF WILL            )
COUNTY, ILLINOIS, a public           )
agency, DOUG WILSON, and MIKE        )
COSTIGAN,                            )
                                     )
          Defendants.                )


MEMORANDUM OPINION AND ORDER

_____

     Before me is a motion for summary judgment brought by

defendants Office of the Chief Judge of the Circuit Court of Will

County, Illinois (the "Office of the Chief Judge"), Doug Wilson

("Wilson") and Mike Costigan ("Costigan") (collectively

"defendants") on the claims brought against them by plaintiff Laura

J. (Munch) Simpson ("Simpson").[1] Simpson, a former employee of the

Office of the Chief Judge, contends that defendants denied her

request for a leave of absence and later terminated her employment

in violation of the Family and Medical Leave Act of 1993, 29 U.S.C.

_____

     [1]During some of the events giving rise to this litigation,
before Simpson married and took the last name Simpson, she went by
the last name Munch; in many of the documents and exhibits
submitted by the parties Simpson is referred to as "Laura Munch."
For uniformity and to avoid confusion, throughout this opinion
Simpson is referred to as "Simpson."

§ 2601, *et seq.* (2007) ("FMLA"). For the following reasons, I grant defendants' motion.

I.

Summary judgment is appropriate where the record and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Steen v. Myers*, 486 F.3d 1017, 1021 (7th Cir. 2007) (citing Fed. R. Civ. P. 56(c)). If the moving party meets this burden, the non-moving party must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 694 (7th Cir. 2006) (citing Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990)). The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

In this case, taking the facts in the light most favorable to Simpson, the relevant facts are as follows:[2] prior to September 23, 2002, Simpson was employed as the Facility Director of River Valley Detention Center ("RVDC"), a detention center in Will County, Illinois that houses a juvenile detention facility. The Office of the Chief Judge oversaw the RVDC, and Simpson was an at-will employee of that office. During the relevant portions of Simpson's employment at the RVDC, Judge Rodney B. Lechwar ("Judge Lechwar") served as the Chief Judge. He made all decisions concerning hiring, firing, and transferring employees of the office. Neither Wilson nor Costigan had the authority to hire or fire Simpson.

Simpson was responsible for drafting and developing a policy and procedures manual for the RVDC. The policies and procedures in the manual applied to her, as did the RVDC "Rules of Conduct." One of the rules provided that RVDC employees should not "fraternize with" any person in custody. Other rules were that the RVDC

---

[2]Defendants have moved to strike certain of Simpson's responses to their Local Rule 56.1 statement of facts, as well as certain portions of Simpson's own statement of facts, along with certain exhibits upon which those responses and statement rely, on the grounds that they do not comply with the local rules or are otherwise inadmissible or improper. While I decline to grant defendants' motion, I will not consider the portions of Simpson's response, or any portion of Simpson's own statement of facts, that do not comport with the local rules or rely on otherwise inadmissible evidence. I note, too, that some of defendants' responses to Simpson's statements of fact also do not comply with the local rules; many contain denials without explanation or citation to the record.

director must maintain personnel files for every employee, and must "in a timely manner" contact a juvenile's parent or guardian and the responsible agency in the case of serious illness, surgery, injury or death. The rules stated that "unsatisfactory performance" included violations of the Rules of Conduct or violations of certain written procedures.

RVDC also had written policies concerning sick leave. RVDC Policy No. 2.08 stated that members who claimed disability leave for three consecutive working days had to furnish "proof of their illness or injury" before returning to work. This same policy provided that members must "personally call in sick" and tell their supervisor "the nature of their illness or reason for their use of sick/disability leave." Further, members had to report their absences for each day that they were sick unless a staff member previously informed a supervisor that he would not be returning to work until a certain day in the future.

When Simpson was the director of the RVDC, she held the highest-ranking position there. This changed on September 23, 2002, when the Office of the Chief Judge created a "Court Services Department." Simpson was made the superintendent of this department. She reported to Wilson, the assistant director, who in turn reported to Costigan, the director, who in turn reported to Judge Lechwar. During her employment with the Office of the Chief Judge, Judge Lechwar gave Simpson several merit-based pay raises.

Prior to and after her transition to superintendent, Simpson had been seeing Dr. Daniel Clark ("Dr. Clark"). Dr. Clark treated Simpson for various reasons between October of 2000 and October of 2002. On October 27, 2001, Simpson saw Dr. Clark for knee pain, and he noted that Simpson's knee was locking and that there was pain, swelling, and bruising. On August 30, 2002, Dr. Clark referred Simpson to an orthopedic specialist, Dr. Farrell, for treatment of her right knee because her knee pain was no better than before.

Simpson testified in her deposition that on September 23, 2002, after Judge Lechwar informed her he was creating a new Court Services Department, she told Judge Lechwar and Costigan that the next day she had a doctor's appointment with an orthopedic surgeon. Although she argues in her statement of facts that on September 24, 2002, Wilson was advised of her "wanting to take sick time off because she had physical problems," she also stated in her deposition that during a meeting with Wilson on September 24 she did not recall her physical condition "coming up in conversation." There is no other evidence that on this date Wilson was aware of her physical condition or of her desire to take sick leave at this time.

On September 24, 2002, Dr. Farrell saw Simpson for the first time and diagnosed her with chrondomalacia of the right patella, a cartilage problem that creates pain beneath the kneecap. The day

before Simpson saw Dr. Farrell, on September 23, 2002, she told Judge Lechwar that she could not walk well and was seeing Dr. Farrell the next day. Judge Lechwar admitted in his deposition that at some point he became aware that Simpson had "something going on with her leg or knee."

On October 15, 2002, Simpson sent Wilson a memorandum that stated:

> Please be advised that I will be taking 3 sick days over the course of the next three weeks. My first scheduled Doctor's appointment is Wednesday, October 16, 2002. The second appointment is actually an appointment for my daughter at Children's Memorial Hospital on Tuesday, October 22, 2002. My second Doctor's appointment is Thursday, October 31, 2002. I currently have adequate sick time to cover these absences. This is for your information and records.

On October 16, 2002, someone in Dr. Clark's office completed a note for Simpson that stated that Simpson was "off work till [*sic*] 10/31/02." Dr. Clark testified that he authorized his staff to draft this note because he wanted Simpson to see Dr. Farrell. Simpson gave this note to Wilson. Wilson also testified in his deposition that he recalled talking to Costigan around October 16, 2002, and receiving "something from [Costigan] that indicated that [Simpson] had a knee problem."

On October 31, 2002, someone in Dr. Farrell's office completed a note for Simpson that stated that she was "off work until further notice." Simpson also gave this note to Wilson. Dr. Farrell

authorized this note because he wanted to suspend Simpson's work activities until he had determined an appropriate course of action.

Simpson testified that she called Wilson on November 1, 2002 to tell him about her doctor's recommendation that she take off work until further notice. According to Simpson, Wilson then told her she would need to call in sick every day so that he could notify his superiors of her status. Simpson testified that after asking him if this was necessary, since she was busy, she said to Wilson, "I'm just going to file for FMLA, please send me the paperwork for FMLA." She testified that Wilson responded that he would not send her the paperwork, and that she was not eligible for FMLA because she had not been at her present position for more than a year. Simpson also contacted someone at the Will County Human Resources Department and was also told that she could not have FMLA paperwork from that source, either. According to Simpson, she did not contact Judge Lechwar about her request because on November 6, 2002, she received a memorandum prohibiting her from contacting Judge Lechwar's office without his permission.

On November 8, 2002, Simpson sent Wilson a fax stating, "I will not be in today per my medical leave." On November 12, 2002, Simpson again faxed Wilson, "Per my Doctor's note, I will not be in today." Simpson sent identical faxes to Wilson on November 13-15, 18-19, 21, and 25, 2002. On November 19, 2002, Costigan called Simpson and asked her to provide him with documentation regarding

her diagnosis, prognosis, and when she would return to work. He did so because Wilson had asked him to "keep tabs on Laura."

On November 19 or 20, 2002, Simpson contends that Wilson and Costigan called her and told her to come in to work to attend some meetings. When Simpson told them that she was on sick leave, Costigan told her that he needed a note from her doctor specifically prohibiting her from coming in for those meetings. During a telephone conversation Simpson says she told Costigan that she was off on sick leave, that she was feeling harassed, and that she would "be in to handle anything once [she] was off of sick leave, off of medical leave." Simpson subsequently obtained a letter from Dr. Clark. In the letter Dr. Clark indicated that Dr. Farrell had diagnosed Simpson with chondromalacia of the right knee, that she was scheduled for surgery, and that she would be able to return to work on January 6, 2003. Simpson took this note in person to RVDC, but could not go through the metal detector because she was wearing a metal knee brace. She gave the letter to a courthouse security officer to deliver to Wilson.

On November 20, 2002, Simpson faxed Wilson informing him that she would not be in "per [her] Doctor's orders" and requesting time cards and pay stubs be sent to her home. On November 22, 2002, Simpson faxed Wilson:

> Please be advised that persuant [*sic*] to my
> Doctor's order dated October 31, which you
> received on Monday, November 4, 2002, I am
> still on medical leave and will not be in

> today. This fax shall serve to fill the
> directive I received on Friday, November 1,
> 2002 that I was requirred [*sic*] to notify you
> on a daily basis, while on medical leave, that
> I would not be in. This is for your
> information and records.

On December 16, 2002, Dr. Farrell performed arthroscopic surgery on Simpson's knee. He authorized her to go back to work on January 6, 2003.

The arguments in defendants' motion for summary judgment relate in part to Simpson's job performance and the job performance of certain employees that she supervised. Certain of those arguments concern Dr. Amy Susko-Brown ("Dr. Brown") who worked as a psychologist at the RVDC. In July of 2002, at the request of Will County Board Member Ann Dralle ("Dralle"), the Deputy Auditor of the Will County Auditor's Office, Catherine Pleasant ("Pleasant"), began to conduct a financial audit of the RVDC. Pleasant testified that she did not speak to Simpson during her financial audit because it occurred while Simpson was on sick leave. Pleasant then drafted a "Review and Recommendation Report" sometime early in the fall of 2002. She later updated that report as of October 30, 2002. Costigan, Wilson, and Judge Lechwar all received copies of Pleasant's reports. Certain of Pleasant's conclusions concerned Dr. Brown. According to Pleasant, her audit found certain potential liabilities to Will County stemming from purported improprieties by Dr. Brown that Dr. Brown engaged in with Simpson's knowledge, including spending very little time working

for Will County, "fraudulent billings" to the county, having staff members administer psychological tests to juveniles, performing work for other counties while employed by Will County, and ignoring house referrals.[3]  On September 12, 2002, Dr. Brown submitted a letter of resignation stating in part that she believed her work on behalf of Will County was not valued.  On September 24, 2002, Dr. Brown submitted another resignation letter requesting "two weeks of paid vacation and three paid sick days."

Pleasant also found that some of Simpson's own behavior was a potential liability to Will County, including "befriending and preferential treatment of a juvenile" housed at RVDC, approving "questionable payments for sick and vacation time" for Dr. Brown "when no attendance records were kept," and negligently handling an attempted suicide at the RVDC in the summer of 2002.[4]  The first of these findings refers to Simpson's relationship with S.M., who was previously a juvenile in custody at the RVDC.  In late 2001, while in custody at RVDC, S.M. disclosed to Simpson that she suffered physical and sexual abuse at home.  S.M. subsequently appeared before a Will County judge on October 19, 2001, to determine

_____

[3]Dralle initially asked Pleasant to look for "double billing" by Dr. Brown; Pleasant did not find any double billing or fraudulent payments by Dr. Brown.

[4]This finding refers to an attempted suicide at the RVDC on August 17, 2002.  Simpson was told that there was a serious suicide attempt at the RVDC on August 17, a Saturday; she did not tell the Office of the Chief Judge about the attempt until Monday, August 19, 2002.

whether she should be placed in the custody of the Division of Child and Family Services ("DCFS") after leaving the RVDC.  The judge issued a temporary order placing S.M. in DCFS custody, allowing her to be placed in foster care, and also stated at the hearing, directing her statement to an employee of the agency responsible for foster placement:

> We can't give out foster parents' names and addresses, I know that.  But it's really important for this young lady who looks at [Simpson] as kind of a stand-in mom to be able to contact her when she needs to.  I don't know how you can coordinate it, but make sure you do . . . . Give her your work number if you choose to do so, [Simpson].  But, please, let the foster parents know that [Simpson] has been helping this kid out.  If this kid needs to call her, that's a good thing, not a bad thing.

(*In re S.M.*, Nos. 2001 JA 89, 2001 JD 30, Report of Proceedings Oct. 19, 2001, at 18.)[5]

After the hearing Simpson contacted Kurt Sangmeister, the court administrator, and informed him about the judge's order. Sangmeister called her back and told her, "[F]ine, go ahead, if that's what the judge wants, you are acting as a private citizen at that point."  Subsequently Simpson did sign S.M. out of the DCFS facility in which she was residing and took her on excursions, but none of these excursions took place while S.M. was at the RVDC.

---

[5]During this proceeding S.M. also stated her desire to continue to have contact with Simpson's co-worker Anthony Malito ("Malito"), and the judge approved such contact.  *Id.*

On September 30, 2002, the same judge entered an order pertaining to S.M.'s case that stated:

> It is hereby ordered by the court with the agreement of the minor and her attorney that the minor may continue to have contact with [Simpson and Malito] of the detention center. The minor requested contact and the court previously found that it was in the minor's best interest following minor's disclosure regarding abuse at her home which she disclosed while in custody. The court had previously ordered this and has allowed their contact.

*In re S.M.*, No. 2001 JA 89, Order at *1 (Cir. Ct. of Will Co., Sept. 30, 2002).

Pleasant's report specifically recommended that Simpson be terminated.[6] Simpson was terminated on November 23, 2002.[7] In the official termination letter provided to her, no reason was given for her termination. At a termination meeting the same day, attended by Simpson, Judge Lechwar, Costigan, Judge Lechwar's assistant, and Simpson's counsel, Simpson testified that Judge Lechwar provided reasons for her termination, including the situation with Dr. Brown, Simpson's relationship with S.M.,

---

[6]The report states, "In her position as Director, [Simpson] has put the County of Will at risk for embarrassment and lawsuits. She has committed fraudulent acts by allowing the wrongdoings described above. She has violated the RVDC code of conduct on more than one instance."

[7]There is no dispute that around the time Simpson was terminated she had "hundreds of hours" of accumulated sick time, and that Will County allowed employees to be paid for sick time while at the same time taking FMLA leave.

mishandling a suicide attempt that Judge Lechwar first heard about by reading about it in the newspaper, the fact that she purportedly did not get along with "Judge Penn," and that she "did not keep people informed." According to Simpson, Judge Lechwar also stated that Dralle was unhappy with Simpson's performance and that her unhappiness was affecting other departments Judge Lechwar oversaw since Dralle was withholding funding and cooperation.

Simpson subsequently brought her present claims against defendants. She alleges that she was denied her substantive FMLA rights when defendants willfully demoted her from her position in order to avoid her rights under FMLA, and was terminated both to interfere with and in retaliation for Simpson exercising her FMLA rights.

II.

The FMLA gives employees the right to unpaid leave for up to twelve weeks for reasons including the employee's serious health condition. 29 U.S.C. § 2612(a)(1). After returning from such leave, the employee is entitled to go back to the position she held when she took such leave, or an equivalent position. 29 U.S.C. § 2614(a)(1). The FMLA prohibits employers from interfering with, restraining, or denying the exercise or attempted exercise of any right the FMLA provides. 29 U.S.C. § 2615(a)(1). The FMLA also prohibits an employer from discharging or discriminating against an employee for opposing an employer's unlawful practice. *Id.* at §

2615(a)(2). To prevail on her claim that defendants interfered with her rights under the FMLA, Simpson must show that (1) she was eligible for the protection of the FMLA; (2) the Office of the Chief Judge was covered by the FMLA; (3) she was entitled to FMLA leave; (4) she provided sufficient notice of her intent to take leave; and (5) the Office of the Chief Judge denied her FMLA benefits to which she was entitled. *See Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006) (citing *Hoge v. Honda Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004)). In addition, where an employee is terminated while on FMLA leave, the court must determine whether the termination was improperly motivated by the employee's decision to take leave or by other valid reasons. *Phelan v. City of Chicago*, 347 F.3d 679, 683 (7th Cir. 2003) (citing *Kohls v. Beverly Enters. Wisconsin, Inc.*, 259 F.3d 799, 804 (7th Cir. 2001)).

A.

Defendants first argue that Simpson cannot show that she provided defendants sufficient notice of her intent to take leave. Under the FMLA, an employee must provide the employer with at least enough information to put the employer on notice that she needs FMLA-qualifying leave. *Horwitz v. Bd. of Educ.*, 260 F.3d 602 (7th Cir. 2001) (quoting *Stoops v. One Call Communications, Inc.*, 141 F.3d 309, 312 (7th Cir. 1998)). Further, regulations provide:

> An employee must provide the employer at least
> 30 days advance notice before FMLA leave is to
> begin if the need for the leave is foreseeable
> based on . . . planned medical treatment for a

> serious health condition of the employee. . .
> . If 30 days notice is not practicable, such
> as because of a lack of knowledge of
> approximately when leave will be required to
> begin, a change in circumstances, or a medical
> emergency, notice must be given as soon as
> practicable. . . . Whether the leave is to be
> continuous or is to be taken intermittently or
> on a reduced schedule basis, notice need only
> be given one time, but the employee shall
> advise the employer as soon as practicable if
> dates of scheduled leave change or are
> extended, or were initially unknown.

29 C.F.R. § 825.302(a).

Defendants do not argue that Simpson did not have a "serious health condition" as required for coverage under the FMLA, see 29 U.S.C. § 2612(a)(1)(D), but they do argue that Simpson did not give them enough information from which they could determine that Simpson's condition was potentially covered by the FMLA. Taking the facts in the light most favorable to Simpson, Simpson told Judge Lechwar on September 23, 2002 that she was having difficulty walking and was seeing a doctor the next day. Wilson also testified that around October 16, 2002, he knew from Costigan that Simpson had a knee problem. Simpson had also provided defendants with doctor's notes on October 16 and October 31, 2002. Those notes stated that Simpson would be off work, but did not give any reason for Simpson being absent. Even taking the facts in the light most favorable to Simpson, there is no evidence that before October 31, 2002 defendants had sufficient notice to render Simpson's absences up to that date covered by the FMLA. Although

15

there is evidence that before October 31 defendants knew that Simpson had a knee problem and that a doctor recommended she take leave, they did not have sufficient details about her condition to understand whether it was serious or what it entailed. *See, e.g.*, *Phillips v. Quebecor World RAI, Inc.*, 450 F.3d 308, 311-12 (7th Cir. 2006) (citations omitted) (holding that where an employee merely requests leave and notifies an employer that she is "sick," the employee has not sufficiently put the employer on notice that she might require FMLA-covered leave).

On November 1, 2002, however, Simpson says she talked to Wilson and told him about her doctor's recommendation. Simpson says after Wilson asked her to call in sick every day, she said she wanted to apply for FMLA. Wilson then told her she was not eligible. Taking this as true, defendants were on notice as of November 1 that Simpson wished to apply for FMLA. Since defendants have not argued that Simpson was not eligible for FMLA, they can hardly be heard to complain they lacked notice when Simpson asked for FMLA paperwork to establish she was covered by FMLA only to have Wilson tell her she was not eligible for FMLA.

Defendants also argue that this notice was not timely. Their argument presumes that Simpson "obviously scheduled her surgery with sufficient time that she could have given [d]efendants proper notice." Under the applicable FMLA regulations, an employee should give an employer 30 days notice of the time she needs off. 29

C.F.R. § 825.302(a). Normally, if the need for leave is not foreseeable, an employee should give notice "as soon as practicable under the facts and circumstances of the particular case," normally within "one or two working days of learning of the need for leave." 29 C.F.R. § 825.303(a). If an employee does not give the required notice in the time specified, the employer can deny the employee leave. *Aubuchon v. Knauf Fiberglass GmbH*, 359 F.3d 950, 951 (7th Cir. 2004) (citations omitted). However, the applicable FMLA regulations also specifically provide that

> an employer may not require compliance with stricter FMLA notice requirements where the provisions of . . . [an] applicable leave plan allow less advance notice to the employer. **For example, if an employee (or employer) elects to substitute paid vacation leave for unpaid FMLA leave (see § 825.207), and the employer's paid vacation leave plan imposes no prior notification requirements for taking such vacation leave, no advance notice may be required for the FMLA leave taken in these circumstances.** On the other hand, FMLA notice requirements would apply to a period of unpaid FMLA leave, unless the employer imposes lesser notice requirements on employees taking leave without pay.

29 C.F.R. § 825.302(g) (emphasis added). Here, taking the facts in the light most favorable to Simpson, the situation contemplated by subsection (g) is exactly what occurred. Simpson planned to take paid sick leave while she addressed her knee problems, and she continued to take sick leave until her termination (although she tried, and failed, to obtain FMLA paperwork from defendants). The

sick leave policy defendants include in the exhibits to their motion to dismiss only states that an employee must notify a supervisor "at a minimum of one hour prior to beginning their tour of duty." (Defs. Ex. 21 at 2.) There is no dispute that Simpson had sick leave available to cover the time she took off for her knee problems, and taking the facts in the light most favorable to Simpson she did meet the less stringent notice requirements of this leave policy.[8] Therefore, the normal notice requirements of the FMLA do not apply, and I cannot grant summary judgment to defendants on this basis.

B.

Defendants next argue that Simpson cannot establish her interference claim because she cannot show that she was entitled to reinstatement. An employee may be terminated for poor performance while on FMLA leave only if she would have been terminated for poor performance even if she had not taken leave. *Kohls*, 259 F.3d at 805 (citing *Clay v. City of Chicago Dep't of Health*, 143 F.3d 1092, 1094 (7th Cir. 1998)). As discussed above, when an employee is terminated while on leave the court must determine the employer's motivation behind the termination. *Phelan*, 347 F.3d at 683 (citing *Kohls*, 259 F.3d at 804). The analysis is similar to the burden-shifting analysis under Title VII; Simpson must show that she was

---

[8]There is some dispute between the parties whether Simpson called in every day as required by relevant policies, but Simpson testified that she did call in every day.

18

discharged because she exercised her rights under the FMLA, defendants then may present evidence to show that Simpson was not entitled to reinstatement regardless of taking leave. If defendants can make this showing, Simpson must overcome the defendant's assertion. *Kohls*, 259 F.3d at 804 (citations omitted).

Defendants' motion for summary judgment contends that Simpson was not entitled to reinstatement because she was appropriately terminated for (1) failing to supervise Dr. Brown or document her attendance; (2) allowing Dr. Brown to be present at the RVDC for only a few hours per week and to have psychological tests conducted by clinical interns of staff; (3) allowing Dr. Brown to improperly bill the county; (4) approving Dr. Brown's vacation and sick time requests without appropriate documentation; (5) fraternizing with S.M.; (6) and "myriad other issues."

The only direct evidence Simpson has that these reasons for her termination are pretextual is her deposition testimony concerning the matters that Judge Lechwar discussed with her in her termination meeting. According to Simpson, in that meeting Judge Lechwar raised additional grounds for Simpson's termination not included in Pleasant's report, including that Simpson "did not keep people informed" while out on sick leave. However, even taking as true that Judge Lechwar did make this statement, it only establishes that Simpson was terminated in part because Judge Lechwar felt she did not maintain contact with her work while on

19

sick leave, not that she was being terminated because she took sick leave. Further, even assuming that terminating her on this basis would be improper, defendants have given numerous other reasons for Simpson's departure. In mixed-motive cases, where more than one motive accounts for a decision, "the fact that one of the motives is legally improper does not support a remedy as long as the employer can show that it would have made the same decision based on the legitimate ground alone." *Dranchak v. Akzo Nobel Inc.*, 88 F.3d 457, 461 (7th Cir. 1996).

Rather than relying solely on this statement, Simpson also presents indirect evidence to argue that this explanation for her termination is not credible. *See Jackson v. E.J. Branch Corp.*, 176 F.3d 971, 983 (7th Cir. 1999) (citations omitted) (pretext in Title VII context may be established by indirect evidence). An indirect showing of pretext may be made by "demonstrating that reasons are factually baseless, were not the actual motivation for the discharge, or were insufficient to motivate the discharge." *Id.* (citations omitted). Although to succeed on her claim Simpson ultimately must provide evidence of at least an inference that discrimination was the real reason she was terminated, at the summary judgment stage as long as Simpson shows that defendants' stated reason for terminating her was pretextual I am permitted, though not required, to infer that the real reason she was terminated was to interfere with her FMLA rights. *See id.* (citing

*Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1123 (7th Cir. 1994); *Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1123 (7th Cir. 1998)).

To demonstrate pretext, Simpson primarily attacks Pleasant's audit, which defendants contend they reviewed and relied upon in deciding to terminate Simpson. Simpson points out purported flaws in Pleasant's analysis and investigative process, and also contends that the timing of Pleasant's investigation is suspicious because it began around the time Simpson began complaining of knee pain, and took place while she was off work and without her participation.

Even assuming, taking the facts in the light most favorable to Simpson, that some of Pleasant's report is inaccurate, this alone is not enough for Simpson to establish pretext. The unrefuted evidence is that Pleasant began her initial investigation around July of 2002 when Dralle requested information about possible double-billing at the RVDC. Pleasant did not complete her initial report until the fall of 2002, during the time that Simpson was away on leave. It is unclear at what point Pleasant's investigation evolved from a specific investigation about double-billing into a more general investigation about Simpson's performance. There is no evidence that Dralle or Pleasant, or anyone at the Office of the Chief Judge, knew at the time that Pleasant's investigation began that Simpson was having knee problems. Further, the undisputed evidence is that Pleasant's

report was requested and conducted under the direction of individuals outside the Office of the Chief Judge. Although Judge Lechwar may have relied upon the report in terminating Simpson, and although he testified that the Will County States Attorney recommended he discharge Simpson, it is undisputed that Judge Lechwar had the sole authority to terminate Simpson. Therefore, what Simpson must show to establish pretext is not merely that the report is inaccurate, but that defendants knew that the charges contained in the report were inaccurate, somehow contributed to the inaccuracy of the report, or that defendants otherwise did not believe that the charges against Simpson warranted her termination. Here, even taking the facts in the light most favorable to Simpson, there is no evidence to support any of those conclusions. No matter the reasons for investigating Simpson, there is no evidence from which a reasonable finder of fact could infer that had Simpson not attempted to take FMLA leave, Judge Lechwar would not have terminated her. Here, the undisputed facts demonstrate that Judge Lechwar honestly believed Simpson's performance warranted termination.[9]

Because I conclude that, taking the facts in the light most favorable to Simpson, Simpson did not have a right to be

_____

[9]Simpson also presents evidence to demonstrate that some of the additional reasons Judge Lechwar gave for her termination during the termination meeting were pretextual, including an affidavit from Judge Penn denying any difficulties with Simpson.

reinstated, I need not consider defendants' other arguments in support of summary judgement on Simpson's interference claim. I grant summary judgment for defendants on this claim.[10]

III.

Defendants have also moved for summary judgment on Simpson's retaliation claim that she was terminated in retaliation for exercising her rights under the FMLA. The FMLA prohibits an employer from discharging or discriminating against an employee for opposing an employer's unlawful practice. 29 U.S.C. § 2615(a)(2). The test for retaliation under the FMLA follows the test for retaliation under Title VII. *Burnett v. LFW Inc.*, 472 F.3d 471, 481 n.5 (7th Cir. 2006). Here, for the same reasons discussed above, Simpson has no direct evidence that she was terminated in retaliation for exercising her FMLA rights.

Simpson cites *Sylvester v. Children's Vills. Illinois, Inc.*, 453 F.3d 900 (7th Cir. 2006) in which the Seventh Circuit clarified in the Title VII context that direct evidence of discrimination is

_____

[10]In her response to defendants' motion for summary judgment Simpson also contends that defendants "harassed" her while on leave by asking her to come in for meetings, and calling and asking her when she would return to work. This harassment alone does not establish an interference claim, however, because to establish an interference claim Simpson must show that defendants denied her a right under the FMLA. *See Burnett*, 472 F.3d at 477 (citation omitted). Evidence of mere harassment does not establish she was denied a right under the FMLA. There is no evidence that Simpson was discharged solely because she refused or showed reluctance to come in for meetings or that she would not have been discharged had she not refused or showed reluctance to come in to work for meetings.

any evidence from which a plaintiff can establish "that he engaged in protected activity" and "as a result suffered the adverse employment action of which he complains." *Id.* at 902 (citations omitted). Citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734 (7th Cir. 1994), the Seventh Circuit in *Sylvester* clarified that circumstantial evidence is direct evidence of discrimination where it is "pieces of evidence, none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff." 453 F.3d at 903 (citing *Troupe*, 20 F.3d at 737). Simpson contends that the timing of defendants' investigations and their treatment of Simpson is sufficient circumstantial evidence to survive summary judgment under the direct method. However, what Simpson refers to as "defendants' investigations" is an investigation by a Will County Board member and by the Will County Auditor's Office; there is absolutely no evidence that the Office of the Chief Judge dictated the beginning of that audit or the direction it took. The fact that defendants contacted Simpson during her leave to ask her when she would return, and that Wilson refused to give Simpson FMLA leave paperwork, do not by themselves establish sufficient circumstantial evidence for a finder of fact to conclude that defendants retaliated against Simpson for exercising her rights under the FMLA.

Because Simpson has no direct evidence of retaliation, she must proceed under the indirect method of proof. Under this

method, Simpson must show that after taking FMLA leave she was treated less favorably than other similarly situated employees who did not take FMLA leave, even though her job performance was satisfactory. *Burnett*, 472 F.3d at 481-82 (quoting *Hill v. Stoughton Trailers, LLC*, 445 F.3d 949, 951 (7th Cir. 2006)). In analyzing whether two employees are similarly situated, courts examine whether the employees "(i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications-provided the employer considered these latter factors in making the personnel decision." *Hill*, 445 F.3d at 952 (quoting *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003)). In her response to defendants' motion, Simpson does not identify any similarly-situated employees, instead contending that requiring someone in her position to identify a similarly situated employee "would be unfair and would allow employers to discriminate and retaliate against employees in upper-level positions." However, there is no precedent for finding some plaintiffs exempted from the similarly-situated requirement simply because they are higher-level employees.[11] Here, plaintiff does not

---

[11]Defendants' statement of facts cite to Simpson's answers to certain interrogatories in which she states that certain employees are similarly situated to her. However, Simpson does not argue in her response that any employee is similarly situated to her; she instead contends that she need not fulfill this requirement. Further, Simpson makes no arguments concerning how any of the employees identified in those interrogatory answers fulfill any of

even argue in her response that any employee is similarly situated to her.  There is no evidence in the record concerning any other employee of the Office of the Chief Judge who was similarly situated to Simpson and who did not take FMLA leave but was treated more favorably than Simpson.  Because she cannot show any other employee is similarly situated to her, she cannot establish that she was retaliated against for exercising her FMLA rights, so I grant summary judgment for defendants on this claim as well.

IV.

In Simpson's complaint she also alleged that defendants denied her the protection of the FMLA by willfully demoting her so that she was unable to assert her rights under the FMLA.  (Compl. ¶¶ 28-30.)  In their motion for summary judgment defendants do not address Simpson's willful demotion claim, but instead contend that Simpson was not entitled to reinstatement after she returned from sick leave because she was properly terminated for other reasons. In her response, Simpson also does not press or reference her willful demotion claim.  While normally this might leave her willful demotion claim intact, *see, e.g.*, *Childs v. Earle M. Jorgensen Co.*, No. 00 C 5853, 2001 WL 1607565, at *2 (N.D. Ill. Dec. 17, 2001) (comparing conflicting precedent from the Seventh Circuit on whether a claim not addressed in a defendant's motion

---

the requirements of similarity identified in *Hill*, and from the interrogatory answers themselves I cannot conclude that any are.

for summary judgment survives when a plaintiff does not raise it in her response),[12] because of the resolution of Simpson's other claims this claim does not seem to survive summary judgment. The FMLA prohibits employers from interfering with, restraining, or denying the exercise or attempted exercise of an FMLA-provided right. 29 U.S.C. § 2615(a)(1). Simpson's claim is that the defendants interfered with her right to take FMLA leave by demoting her so that she purportedly was not able to take FMLA leave. However, Simpson testified in her deposition that the first time she told any of the defendants anything about her knee problems was on September 23 *after* she received a memorandum from Judge Lechwar indicating he wanted to have a meeting with her and after that meeting began and Judge Lechwar told her he was restructuring and she would no longer be director. Additionally, the undisputed facts as discussed above are that although defendants refused to provide Simpson with an FMLA form and never "formalized" her leave, they also did not prevent her from taking the leave that she sought. Simpson sent in her doctor's note, and although defendants required her to check in, there is no evidence that Simpson was

---

[12]The conflicting cases the court discusses in *Childs* are *Nabozny v. Podlesny,* 92 F.3d 446, 457 n.9 (7th Cir. 1996) (holding a non-moving party's failure to raise an issue in responding to a motion for summary judgment does not result in waiver) and *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 810 (7th Cir. 2001) (holding that a non-moving party's failure to note that a certain claim was not addressed in a defendant's motion for summary judgment does result in waiver of the claim).

denied any right due under the FMLA.  However, a court normally may not grant summary judgment unless the losing party has notice and an opportunity to come forward with all of her evidence.  *See Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006) (citations omitted).  Therefore, I will give Simpson 21 days to present any evidence and argument why I should not grant summary judgment on this claim as well.

V.

For the reasons stated above, defendants' motion for summary judgment is granted.  I deny defendants' motion to strike as moot. I give Simpson 21 days to show why I should not grant summary judgment on her willful demotion claim.

**ENTER ORDER:**

_____
        **Elaine E. Bucklo**
     United States District Judge

Dated: October 11, 2007